## Wilson v. Commonwealth.

(Decided May 5, 1925.)

### Appeal from Harlan Circuit Court.

1. Infants—Circuit Court has Jurisdiction to Try Male for Murder Committed After Seventeenth Birthday.—Ky. Stats., sections 331e-2, 331e-5, 331e-9, giving county courts exclusive jurisdiction of delinquent males "17 years of age or under," do not apply to one who has passed his seventeenth birthday, and circuit court may try him for murder committed thereafter.

2. Criminal Law—Guilt Must be Established to Exclusion of Reasonable Doubt.—Accused's guilt must be established by evidence to exclusion of reasonable doubt.

3. Criminal Law—Jury Cannot Disbelieve all Witnesses Because of Apparent Improbability of their Story and Adopt Equally Improbable Theory Based on Mere Suspicion.—On conflicting evidence, question of guilt is for jury whose province it is to pass on credibility of witnesses and weight of their testimony, and they may reject accused's evidence or testimony of any witness for commonwealth, or render verdict in accordance with physical facts and circumstances, but cannot disbelieve all witnesses, because of apparent improbability of their story, and adopt equally improbable theory based almost entirely on mere suspicion.

4. Homicide—Conviction of Murder Held Flagrantly Against Evidence.—Verdict finding defendant guilty of murder and fixing punishment at life imprisonment held flagrantly against evidence.

5. Criminal Law—Physician's Testimony as to Acts of Intercourse Indicated by Examination of Deceased's Body Held Admissible.— In murder prosecution, testimony of physician, unable to say from his examination of deceased's body, whether more than one person had had intercourse with her, or one person had done so more than once, held admissible for what it was worth.

J. S. FORESTER for appellant.

FRANK E. DAUGHERTY, Attorney General, and MOORMAN DITTO, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE CLAY—Reversing.

Appellant was convicted of murder and his punishment fixed at life imprisonment.

The first ground on which a reversal is asked is that the trial court was without jurisdiction because appellant was only 17 years old when the alleged offense was committed. Under our statutes county courts have exclusive jurisdiction of all dependent, neglected or delinquent children, and circuit courts have no jurisdiction to indict or try such children for a violation of the laws of the state unless they have been transferred to the circuit court by order of the county court. Sections 331e-2, 331e-5, 331e-9, Kentucky Statutes; Commonwealth v. Franks, 164 Ky. 239, 175 S. W. 349. But it is expressly provided that "this act shall apply only to male children seventeen years of age, or under, and to female children eighteen years of age, or under." It is insisted that the act applies to appellant because his seventeenth birthday occurred on November 29th, 1924, and at the time of the commission of the offense in the month of August, 1924, he had not reached his eighteenth birthday. The precise question was before the court in the recent case of Thompson v. Commonwealth, 201 Ky. 19, 255 S. W. 852, and it was there held that the act applied only to children who were seventeen years of age, or under, and not to children who had passed their seventeenth birthday and had not reached their eighteenth birthday. It follows that appellant was properly tried in the circuit court.

The contention that the verdict is flagrantly against the evidence requires an extended statement of the testimony. The first witness for the Commonwealth, Dr. Howard, testified that he examined the deceased, Lucy Brock, and found that she had been shot in the forehead, perhaps by a 38 special. From his examination of her person he concluded either that more than one person had had intercourse with her, or that one person had had intercourse with her more than once, but was unable to say which. Milton Simpson, an uncle of the girl, testified that she was about 14 years of age, but was large for her age. She made her home most of the time with her stepfather, Jim Blanton. He saw her the day before the tragedy on Phillip's fork. On the day she was killed he was coming to Wallins creek and before he crossed Pine mountain he heard one shot. After that he saw appellant, but did not see Clell Ward or Delphine Forester. At

that time appellant was lying back up against the bank and had a gun in his hand that looked like a 38. Witness spoke as he rode by on a mule, but did not remember, whether appellant spoke or not. At that time he did not know that the girl had been killed. Afterward he saw the place where witness said that the girl had lain, and it was something like 50 or 60 yards from where appellant was. James Blanton, the girl's stepfather, testified that she was killed on August 13th, 1924. At the time she was over at one of her uncle's. She would have been 15 years of age her next birthday. Squire Green Long, who held the inquest at the place of the homicide, saw the girl's body lying on the ground. It must have been one o'clock when they got there. Her body was lying two or three steps outside of the road. At that point the road forks and it was on the left-hand or upper fork. The space between the forks looked to him like five or six steps. When they reached the girl she was not dead, but died about an hour later. The witnesses at the inquest were three boys, Ward, Wilson and Forester, and Sindy Brock and another woman. Witness never saw any signs of any scuffle, pulling or hauling the body of the deceased, or anything of that kind. He saw appellant and appellant had been shot, but he did not examine him and could not say how many times. On being recalled, Jim Blanton testified that when the girl's clothing was taken off there were dried leaves on her back, eight or ten of them. He further stated that she did not have on any underwear, but wore only a dress made out of outing. George Morgan found Lucy Brock lying below a little path. There was another path 15 or 20 feet from where she was, and the two paths came together. He stepped the ground from where she was lying to where the Forester boy said she was shot, and it was about six steps from where she was to where appellant was shot. It was a little slanting where the girl was. Though there were small bushes, trees or logs between the two paths, there was nothing to prevent one going from one path to another. Clell Ward, a young man eighteen years of age, who lived on Straight creek in Harlan county, first saw Lucy Brock at the limestone spring on Straight creek near the foot of Pine mountain, which was about two miles from where she was killed. He had never known her before that time. He went to the spring to get a drink and got there first. He had started across the mountain to go to appellant's home. Just after he got

there Lucy appeared and he got her a drink. In four or five minutes they left. She had a suitcase and he asked her to let him carry it. In going up the mountain they stopped at the halfway place as he was tired. They remained there for about 20 minutes. About that time Delphine Forester caught up with them. He did not know Forester was coming. Forester lived at Emerling and had been at Lige Howard's the night before. When he joined them they traveled more than a mile. They all proceeded across the mountain. He carried the suitcase and they went to the top of the mountain. When they got there they went off the road for about fifteen minutes, at the suggestion of Lucy, who said she wanted to look off the mountain. They came back to the road together. Before that, however, they had gone to Joe Wilson's home and Freeman Wilson had joined them. Freeman was his "buddy." When they went into the house Freeman was cleaning a pair of pants. When they left Freeman started with a 38 special and witness took a 45 Colt. He never told Freeman who was with him until they started out the gate, when he told him they were with a woman. On reaching the top of the mountain Forester and the girl were sitting in about the same position they were in when he left them. The four of them then wound around the mountain. Freeman Wilson was carrying the suitcase. In starting off Forester was in front, witness was next, but in a different path, and Freeman and the girl were in the rear. He heard one of them "holler," "Oh, Lord, you have shot me." There were three shots in rapid succession, followed by a fourth shot. He was so scared he didn't look around. When this occurred he started to run, but Freeman "hollered" and he went to him. At that time the woman was lying on the ground down the hill about four steps from Freeman. Freeman said he had shot her. Freeman asked to be taken home. They picked him up and carried him a little piece down the hill. At that time his clothing was on fire and they put it out. He then left and went to the home of Joe Wilson, Freeman's father. Delphine Forester went to Brock's, down the creek. Before the shooting occurred, Freeman had gotten the 45 from him. He did not curse in the presence of the deceased. After going to Freeman's father's house, he returned to help carry him to Wallins. There were some people there with the girl. The shooting occurred about 10:30 in the morning. After the shooting Freeman had both pistols in his hand. On cross-exami-

nation witness stated that Lucy Brock said that she had lain out the night before with Joe Saylor. When he examined the holster containing the 45, he found the end of it had been shot out. On re-direct examination he identified a shoe as being the left shoe that Freeman wore. On the inside of the heel there was a bullet hole. There was also a bullet hole in the suitcase. Up to the time of the shooting there were no bullet holes in the valise. When he first saw Freeman after the shooting he was sitting down on the ground. Delphine Forester first saw the girl when he overtook her and Clell Ward on the mountain. At the time they were walking "sorter" slow, and Clell was carrying the suitcase. Witness had been across the mountain to Elijah Howard's and was coming across the mountain to Emerling. At that time he did not know the girl and had never seen her. She said her name was Lucy Brock. On the top of the mountain Clell said he was going down and get his "buddy," Freeman Wilson. He was gone about twenty minutes. In the meantime he and the girl were on top of the mountain. She had her dress on wrong side out and he stepped aside a piece for her to put it on right. Freeman and Clell came back together. Clell had the 45 and Freeman the 38 special. No one of them had anything to do with the girl. At one time they heard some one coming. The girl thought it was Hence Vaughn and she was afraid of him. They went off to the top of the hill on a little knoll. The place to which they went was about 30 yards from the road. The girl got leaves on her back when she fell after the shooting. While they were all standing there the girl had the 45 in her hand and pulled the lock back. After that they started along the mountain and Freeman was carrying the valise. As they moved along he was in front, Freeman next, and Clell Ward next, but Clell was in another path when the shooting began. As they were going along Clell Ward cursed two or three times. Freeman said he ought not to curse before the girl. At that time Freeman took Clell Ward's pistol from him and put it on himself. Freeman then had on the two pistols. As they were walking along he heard three 45's and one 38 special fired. When this occurred he did not know hardly what he was doing. Freeman Wilson "hollered" that he had been shot. When he looked around both Wilson and the girl were falling. They were about three or four steps apart. Wilson had the 38 in one hand and was picking the 45 off the ground, or had gotten it off the ground. At that time he

was "sorter" lying on the ground on his legs.. He picked up the 45 from the ground or holster one, and handed it to Clell Ward. He then asked them to take him home. He was scared pretty badly at the time and thought the girl was killed. They started with Freeman and when they got to the big gate had to let him down. He then went and got the woman and brought her back to where she was lying. She was further away from the road than she was when they left. On cross-examination he stated that they went down to the level place with Freeman and then went for help. Clell Ward took the 45 off Freeman. Prior to the difficulty he saw Freeman taking the pistol from Clell Ward and buckle it around himself. James Garrett, at the time of the homicide, was working for Joe Wilson, appellant's father, and heard some shooting. He did not pay much attention to it, but thought there were five shots. There were three small shots and two large ones. The Commonwealth's attorney then inserted a 38 cartridge in the hole in the shoe and also in the hole in the valise. At the same time he inserted a 45 cartridge in the hole in the suitcase. On re-examination Squire Green Long testified that he did not see any blood or mashed leaves on the ground indicating that the girl had wallowed around. George Morgan, who was recalled, testified that there was evidence of somebody having wallowed around where the body of the deceased was found. He also stated there were some leaves there. On being recalled, Delphine Forester testified that he saw the girl falling. She fell over a sort of a log close to the bush. On cross-examination he stated that she fell down the road and Freeman fell the other way.

On the other hand, appellant testified in substance as follows: He was at home on the morning of the homicide. Clell Ward came to his house. He was then engaged in pressing a suit of clothes. They left together. He carried the 38 and let Clell have the 45. When they got back to the top of the hill they found Forester and the girl. It was about a hundred yards from his home. After that they started off together and he carried the suitcase. It was about a mile from that point that the shooting occurred. Going along the road he got the pistol back from Clell. When they were near the big gate Forester was in front, witness was next, Lucy Brock was next and Ward was over on the left, in another path. There was a space of about six feet between the paths. The girl was walk-

ing along with her hand on his left shoulder. At that time he had the 38 on his right side and the 45 on his left. He had on a pair of overalls and a blue shirt. As they were walking on the road was too narrow to walk side by side. He bent over to set the suitcase down. He was then aiming to go towards Daniel Brock's. The girl's hand slipped off his shoulder and she commenced shooting with the 45. She shot three times. He then started after his gun, which was on the right side, and threw it over his left shoulder and fired once. She ran back. It knocked her down the hill. He then picked up the 45 and handed it to Clell Ward, also the holster and belt. At that time both bones in his leg were broken and he was also wounded in the left foot. Just before the shooting he had told her that he could not go any further. When the other boys picked him up and started towards his home the girl was lying down on the lower side of the road. He remained in the road about a half hour after they left. He heard Mr. Simpson passing, but did not speak. He was afterwards carried to the hospital at Pineville and remained there for eight weeks. The hole in the shoe was made by a 45. If the hole in the shoe was smaller than that bullet it was because it had drawn up. He never shot into the suitcase himself, but only fired the one shot which struck the girl. Just after the shooting his overalls were on fire. He put it out once, and Clell put it out once. On cross-examination he stated that he aimed to go to Straight creek to trade a gun. As he set down the suitcase she began shooting from his left side. He did not stop her from getting it because she took hold of it too quickly and shot him before he knew it. He was bent over and this prevented him from getting his gun before she took it. Just as he set the suitcase down she shot. When Mr. Simpson passed he knew that his niece was lying down the road. Prior to the difficulty he had not had any quarrel with the girl. He did not know she was going to shoot until she did shoot. When he shot he never took any aim, but fired over his shoulder. On re-examination appellant testified that he went about a mile with the girl before the shooting took place. Clell Ward was cursing, but he did not know what he was cursing about. He got the gun from him because he was aiming to turn off. That, and the fact that Clell cursed before the girl, was his reason for taking it. He was carrying the suitcase because she had asked him to do it. Dr. Galloway, who dressed appellant's wounds, testified that one of the

shots passed through the back of appellant's left leg, just below the bend of the knee, going down at an angle of 45 degrees, and coming out in front broke both the fibia and the tibia bones. He did not know the caliber of the gun that made the wounds, but according to his best judgment it was of the largest caliber. There was also another wound on the side of appellant's left heel, an inch and a half from the bottom of the heel. The bullet came out between the great toe and the one next to it. He did not believe there was any difference in the size of the wounds. Joe Wilson, appellant's father, examined the holster and said it was not in the same condition as it was before the shooting. At the time of the shooting Henry Wilson was up the hill with Jim Garrett and heard only four shots. Before the shooting the holster was sewed up and there was a rivet in it. After the shooting it was like it was when presented to him in court. Lucinda Brock, who went to the girl after she was killed, found her lying down the hill with her face and one arm under her. She and Mr. Ward took hold of her and turned her on her back with her head up the hill. There was a good coat of leaves on the ground at that time. At that point there were two paths, a big path and a smaller path. To the best of her knowledge the girl was closer to the upper path.

A careful examination of the foregoing evidence will show that the witnesses for the Commonwealth and appellant are in substantial accord as to what occurred at the time of the homicide. The point is made that Ward and Forester, who testified for the Commonwealth, are friendly to appellant, and that the story told by all of them is highly improbable. At the same time it is suggested that there was evidence tending to show that appellant, Ward and Forester had all violated the person of Lucy Brock and that the crime of murder was committed to avoid the consequences of that crime. There are some features of the story that are hard to understand. It may be that some of the facts were deliberately withheld and that the true reason for the girl's resentment against appellant was not given. However this may be, the story told by the witnesses is not more improbable than that the appellant killed the girl to conceal the crime of rape, and, as a part of that plan, either shot himself in the foot and leg, or had Ward or Forester fire the shots. It must not be overlooked that the guilt of the accused must be established by the evidence to the exclus-

ion of a reasonable doubt. On conflicting evidence the question is always for the jury. It being their province to pass on the credibility of the witnesses and determine the weight of their testimony, they may reject the evidence for the accused and accept the evidence for the Commonwealth. Indeed, they may ignore entirely the evidence of the accused, or of any witness or witnesses for the Commonwealth, and believe the story of some other witnesses for the Commonwealth or for the accused. Doubtless there are instances where the physical facts and attendant circumstances make it clear that the crime was committed in a way altogether different from that detailed by the witnesses, in which event the jury may disbelieve the witnesses and render a verdict in accordance with the physical facts and circumstances. But no such case is here presented, and broad as is the province of the jury in such matters we have never held that they may disbelieve all the witnesses and ignore all their evidence because of the apparent improbability of the story they tell and adopt another theory equally, if not more, improbable and based almost entirely, if not altogether, on mere suspicion. Having this view of the case we are constrained to the opinion that the verdict of the jury finding appellant guilty of murder and fixing his punishment at life imprisonment is flagrantly against the evidence.

As Dr. Howard was unable to say from his examination of the person of Lucy Brock whether more than one person had had intercourse with her, or one person had had intercourse with her more than once, we perceive no reason why his evidence should have been rejected, but conclude that it was admissible for what it was worth.

Judgment reversed and cause remanded for a new trial consistent with this opinion.